**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Aircomm of Avon, LLC; Atlantic Coast
Communications LLC; CCATT LLC; CCTMO
LLC; CCTM1 LLC; CCTM2 LLC; Coverage Plus
Antenna Systems LLC; Crown Atlantic Company
LLC; Crown Castle Fiber LLC; Crown Castle GT
Company LLC; Crown Castle MU LLC; Crown
Castle South LLC; Crown Castle Towers 05 LLC;
Crown Castle Towers 06-2 LLC; Crown Castle
Towers 09 LLC; Crown Communication LLC;
Global Signal Acquisitions LLC; Global Signal
Acquisitions II LLC; Global Signal Acquisitions
III LLC; Global Signal Acquisitions IV LLC;
GoldenState Towers, LLC; High Point
Management Co. LLC; ICB Towers, LLC;
Interstate Tower Communications LLC;
IntraCoastal City Towers LLC; Pinnacle Towers
Acquisition LLC; Pinnacle Towers Asset Holding
LLC; Pinnacle Towers LLC; Pinnacle Towers III
LLC; Radio Station WGLD LLC; Shaffer &
Associates, Inc.; Sierra Towers, Inc.; Tower
Development Corporation; Tower Systems LLC;
Tower Technology Company of Jacksonville LLC;
Tower Ventures III, LLC; WCP Wireless Lease
Subsidiary, LLC; and TVHT, LLC,

        Plaintiffs,

    v.

DISH Wireless L.L.C.,

        Defendant.

Civil Action No. _____

**COMPLAINT FOR DECLARATORY RELIEF**

Plaintiffs Aircomm of Avon, LLC; Atlantic Coast Communications LLC; CCAT LLC; CCTMO LLC; CCTM1 LLC; CCTM2 LLC; Coverage Plus Antenna Systems LLC; Crown Atlantic Company LLC; Crown Castle Fiber LLC; Crown Castle GT Company LLC; Crown Castle MU LLC; Crown Castle South LLC; Crown Castle Towers 05 LLC; Crown Castle Towers 06-2 LLC; Crown Castle Towers 09 LLC; Crown Communication LLC; Global Signal Acquisitions LLC; Global Signal Acquisitions II LLC; Global Signal Acquisitions III LLC; Global Signal Acquisitions IV LLC; GoldenState Towers, LLC; High Point Management Co. LLC; ICB Towers, LLC; Interstate Tower Communications LLC; IntraCoastal City Towers LLC; Pinnacle Towers Acquisition LLC; Pinnacle Towers Asset Holding LLC; Pinnacle Towers LLC; Pinnacle Towers III LLC; Radio Station WGLD LLC; Shaffer & Associates, Inc.; Sierra Towers, Inc.; Tower Development Corporation; Tower Systems LLC; Tower Technology Company of Jacksonville LLC; Tower Ventures III, LLC; WCP Wireless Lease Subsidiary, LLC; and TVHT, LLC (collectively, "Crown Castle" or "Plaintiffs"), by and through undersigned counsel, file this Complaint for Declaratory Judgment against DISH Wireless L.L.C. ("DISH") and allege as follows:

## INTRODUCTION

1.      DISH is a mobile wireless carrier, available to consumers through its Boost Mobile brand. It entered the mobile wireless market in 2019 and sought to build a nationwide, 5G mobile wireless network. DISH contracted with Crown Castle, one of the nation's leading owners and operators of shared communications infrastructure, to secure critical access to that infrastructure as part of its buildout.

2.     This action arises out of DISH's assertion, without any factual or legal basis, that the forthcoming sale by its now parent, EchoStar Corporation ("EchoStar"), of wireless spectrum EchoStar had acquired from the U.S. government to create a nationwide wireless carrier will constitute an event of force majeure.  But contrary to DISH's claim, there has been no unexpected or unforeseeable event outside of DISH's control that precludes DISH from fulfilling its contractual commitments to pay Crown Castle all amounts owed under the two agreements at issue.  To the contrary, all that has happened is that EchoStar made a voluntary decision to sell its wireless spectrum—for *more than $40 billion*—apparently obviating DISH's need for the infrastructure it has contracted for with Crown Castle once those sales are consummated.  That business decision is the ***antithesis*** of force majeure, and Crown Castle is entitled to a declaratory judgment that the agreements the parties entered into remain in full force and effect.

3.     When DISH and its affiliates announced their plan to build a nationwide 5G mobile wireless network in 2019, two things were required: (1) access to licenses to operate the nation's wireless spectrum; and (2) access to cell towers and fiber throughout the country to operate a wireless network.

4.     DISH's then parent company, DISH Network Corporation (which, in 2023, merged with EchoStar (together, "EchoStar")), acquired its spectrum primarily through auctions for spectrum licenses held by the Federal Communications Commission (the "FCC").  To obtain those licenses as well as to secure regulatory approval to acquire Boost Mobile—a wireless carrier previously owned by Sprint—EchoStar made a series of buildout commitments to the FCC, including a guarantee that its 5G wireless network would reach 70% of the U.S. population by 2023.  To fulfill that commitment, DISH entered into a series of contractual partnerships with cell

tower and fiber providers.  The first such agreement was with Crown Castle, which operates 40,000 cell towers and more than 90,000 route miles of fiber across the country.

5.    In November 2020, DISH and Crown Castle entered into a long-term Master Lease Agreement (the "MLA") affording DISH the right to lease space on 20,000 of Crown Castle's cell towers ███████████████ ███████████████████████████████████████ ████████████████████████████████████████ In December 2020, the parties entered into a Master Product Agreement (the "MPA," and together with the MLA, the "Agreements").  The MPA affords DISH access to fiber and other infrastructure from Crown Castle that is essential to operate the DISH mobile wireless network.

6.    Having previously announced with great fanfare the creation of a fourth nationwide wireless carrier, DISH and EchoStar have now chosen to reverse course.  In the past few months, EchoStar—which is not a party to the Agreements—has entered into contracts with AT&T and SpaceX to sell certain of EchoStar's spectrum licenses for more than $40 billion.  As a consequence, DISH has elected to abandon its planned buildout of a 5G mobile wireless network on the infrastructure that it leases from Crown Castle.  Instead, DISH's Boost Mobile business intends to rely on network capacity from other wireless providers, meaning that DISH will no longer require the cell towers and fiber it has leased from Crown Castle under the Agreements.

7.    Faced with long-term payment commitments to Crown Castle, and with no longer any apparent need for the cell towers and fiber that Crown Castle provides, DISH has invented an excuse to try to avoid its contractual commitments:  that EchoStar was forced by the U.S. government to dispose of its spectrum.  That excuse is a feeble one:  the FCC has issued no order requiring EchoStar to sell any of its spectrum.  In May 2025, the FCC announced an inquiry into

EchoStar's underutilization of its spectrum, but it did not revoke or suspend a single spectrum license held by EchoStar.  Indeed, EchoStar asserted at the time that any effort by the FCC to compel it to give up the spectrum it had won at auction would be "unlawful, unconstitutional, discriminatory, and utterly baseless."[1]

8.      Despite having an array of options to contest any potential action taken by the FCC, EchoStar chose instead to enter into successive deals with AT&T and SpaceX to sell portions of its spectrum.  After those deals were signed, in September 2025 DISH sent two notices to Crown Castle, asserting EchoStar's multi-billion-dollar spectrum sales would constitute force majeure under the MLA and MPA.[2]  DISH further asserted that the spectrum sales were the result of "unforeseeable actions by the FCC taken outside of DISH Wireless's control."  But the FCC had taken no action against EchoStar with respect to its spectrum, and EchoStar freely entered into these sales with AT&T and SpaceX.

9.      EchoStar's spectrum sales do not even remotely approach the stringent requirements of the Agreements or controlling Colorado law with respect to force majeure.  The indisputable facts demonstrate that there have been no unforeseeable events that would excuse DISH from fulfilling its contractual obligations to Crown Castle.  The only basis asserted for invocation of force majeure—that the FCC "compelled" EchoStar to sell its spectrum—is demonstrably untrue.

---

[1]     *See* Reply Comments of EchoStar Corporation, *In the Matter of Space Bureau Opens New Docket to Explore EchoStar Corporation's Use of 2 GHz MSS Spectrum*, SB Docket No. 25-173 before the Federal Communications Commission.

[2]     Subsequently, in a November 10, 2025 letter, DISH additionally asserted that the FCC's actions frustrated the purpose of the MLA.

10.     Moreover, even if, contrary to the facts, the FCC had ordered EchoStar to sell its

spectrum, the Agreements ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

11.     Crown Castle therefore seeks a declaratory judgment that: (i) force majeure has

not occurred under the Agreements; (ii) DISH is not excused from performing its obligations under

the Agreements; (iii) the Agreements remain in full force and effect; and (iv) DISH remains

obligated to perform all of its obligations thereunder.

## PARTIES

12.     Aircomm of Avon, LLC is a signatory to the MLA.  Aircomm of Avon, L.L.C is a

Connecticut company with its principal place of business in Houston, Texas.

13.     Atlantic Coast Communications LLC is a signatory to the MLA.  Atlantic Coast

Communications LLC is a Delaware company with its principal place of business in Houston,

Texas.

14.     CCATT LLC is a signatory to the MLA.  CCATT LLC is a Delaware company

with its principal place of business in Houston, Texas.

15.     CCTMO LLC is a signatory to the MLA.  CCTMO LLC is a Delaware company

with its principal place of business in Houston, Texas.

16.     CCTM1 LLC is a signatory to the MLA.  CCTM1 LLC is a Delaware company with its principal place of business in Houston, Texas.

17.     CCTM2 LLC is a signatory to the MLA.  CCTM2 LLC is a Delaware company with its principal place of business in Houston, Texas.

18.     Coverage Plus Antenna Systems LLC is a signatory to the MLA.[3]  Coverage Plus Antenna Systems LLC is a Delaware company with its principal place of business in Houston, Texas.

19.     Crown Atlantic Company LLC is a signatory to the MLA.  Crown Atlantic Company LLC is a Delaware company with its principal place of business in Houston, Texas.

20.     Crown Castle GT Company LLC is a signatory to the MLA.  Crown Castle GT Company LLC is a Delaware company with its principal place of business in Houston, Texas.

21.     Crown Castle MU LLC is a signatory to the MLA.  Crown Castle MU LLC is a Delaware company with its principal place of business in Houston, Texas.

22.     Crown Castle South LLC is a signatory to the MLA.  Crown Castle South LLC is a Delaware company with its principal place of business in Houston, Texas.

23.     Crown Castle Towers 05 LLC is a signatory to the MLA.  Crown Castle Towers 05 LLC is a Delaware company with its principal place of business in Houston, Texas.

24.     Crown Castle Towers 06-2 LLC is a signatory to the MLA.  Crown Castle Towers 06-2 LLC is a Delaware company with its principal place of business in Houston, Texas.

---

[3]     The MLA identifies this lessor as Coverage Plus Systems LLC instead of Coverage Plus Antenna Systems LLC.

25.     Crown Castle Towers 09 LLC is a signatory to the MLA.  Crown Castle Towers 09 LLC is a Delaware company with its principal place of business in Houston, Texas.

26.     Crown Communication LLC is a signatory to the MLA.  Crown Communication LLC is a Delaware company with its principal place of business in Houston, Texas.

27.     Global Signal Acquisitions LLC is a signatory to the MLA.  Global Signal Acquisitions LLC is a Delaware company with its principal place of business in Houston, Texas.

28.     Global Signal Acquisitions II LLC is a signatory to the MLA.  Global Signal Acquisitions II LLC is a Delaware company with its principal place of business in Houston, Texas.

29.     Global Signal Acquisitions III LLC is a signatory to the MLA.  Global Signal Acquisitions III LLC is a Delaware company with its principal place of business in Houston, Texas.

30.     Global Signal Acquisitions IV LLC is a signatory to the MLA.  Global Signal Acquisitions IV LLC is a Delaware company with its principal place of business in Houston, Texas.

31.     GoldenState Towers, LLC is a signatory to the MLA.  GoldenState Towers, LLC is a Delaware company with its principal place of business in Houston, Texas.

32.     High Point Management Co. LLC is a signatory to the MLA.   High Point Management Co. LLC is a Delaware company with its principal place of business in Houston, Texas.

33.     ICB Towers, LLC is a signatory to the MLA.  ICB Towers, LLC is a Georgia company with its principal place of business in Houston, Texas.

34. Interstate Tower Communications LLC is a signatory to the MLA. Interstate Tower Communications LLC is a Delaware company with its principal place of business in Houston, Texas.

35. IntraCoastal City Towers LLC is a signatory to the MLA. IntraCoastal City Towers LLC is a Delaware company with its principal place of business in Houston, Texas.

36. Pinnacle Towers Acquisition LLC is a signatory to the MLA. Pinnacle Towers Acquisition LLC is a Delaware company with its principal place of business in Houston, Texas.

37. Pinnacle Towers Asset Holding LLC is a signatory to the MLA. Pinnacle Towers Asset Holding LLC is a Delaware company with its principal place of business in Houston, Texas.

38. Pinnacle Towers LLC is a signatory to the MLA. Pinnacle Towers LLC is a Delaware company with its principal place of business in Houston, Texas.

39. Pinnacle Towers III LLC is a signatory to the MLA. Pinnacle Towers III LLC is a Delaware company with its principal place of business in Houston, Texas.

40. Radio Station WGLD LLC is a signatory to the MLA. Radio Station WGLD LLC is a Delaware company with its principal place of business in Houston, Texas.

41. Shaffer & Associates, Inc. is a signatory to the MLA. Shaffer & Associates, Inc. is an Illinois company with its principal place of business in Houston, Texas.

42. Sierra Towers, Inc. is a signatory to the MLA. Sierra Towers, Inc. is a Texas company with its principal place of business in Houston, Texas.

43. Tower Development Corporation is a signatory to the MLA. Tower Development Corporation is a Maryland company with its principal place of business in Houston, Texas.

44.     Tower Systems LLC is a signatory to the MLA.  Tower Systems LLC is a Delaware company with its principal place of business in Houston, Texas.

45.     Tower Technology Company of Jacksonville LLC is a signatory to the MLA. Tower Technology Company of Jacksonville LLC is a Delaware company with its principal place of business in Houston, Texas.

46.     Tower Ventures III, LLC is a signatory to the MLA.  Tower Ventures III, LLC is a Tennessee company with its principal place of business in Houston, Texas.

47.     TVHT, LLC is a signatory to the MLA.  TVHT, LLC is a Tennessee company with its principal place of business in Houston, Texas.

48.     WCP Wireless Lease Subsidiary, LLC is a signatory to the MLA.  WCP Wireless Lease Subsidiary, LLC is a Delaware company with its principal place of business in Houston, Texas.

49.     Crown Castle Fiber LLC is a signatory to the MPA.  Crown Castle Fiber LLC is a New York company with its principal place of business in Houston, Texas.

50.     Defendant DISH Wireless L.L.C. is a Colorado limited liability company with its principal place of business in Englewood, Colorado.  DISH provides wireless, voice and data services in the United States.  DISH is an indirect, wholly owned subsidiary of DISH Network Corporation, which merged with EchoStar Corporation in 2023.  DISH is a signatory to both the MLA and the MPA.

51.     Non-party EchoStar Corporation, is a Nevada corporation that is headquartered in Englewood, Colorado.  EchoStar is currently the ultimate parent of DISH.

## JURISDICTION AND VENUE

52.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

53.     This Court has general and specific personal jurisdiction over DISH.  The exercise of general personal jurisdiction is proper because DISH is headquartered in this District, maintaining its principal place of business in Englewood, Colorado.  The exercise of specific personal jurisdiction is proper because the claims in this action arise out of and relate to DISH's conduct and activities within this District.

54.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because DISH resides in this District.

55.     ███████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████

## FACTUAL BACKGROUND

**I.    ECHOSTAR ACQUIRES BOOST MOBILE AND ENTERS THE MOBILE WIRELESS BUSINESS IN 2019**

56.     DISH is the mobile and 5G network arm of EchoStar.  DISH is a mobile wireless carrier, available to consumers through its Boost Mobile brand.

57.     DISH Network Corporation (now EchoStar) entered the wireless market in 2019 and sought to build a nationwide, 5G mobile wireless network.  In July 2019, EchoStar informed

the FCC of its "Nationwide 5G Broadband Commitment," under which it "plan[ned] to deploy a first-of-its-kind 5G network built from the ground up with an architecture that can take full advantage of expected 5G functionality."[4]  EchoStar further advised the FCC that it was ready to "commit to concrete milestones related to its 5G deployment," including that by June 14, 2023, it would "deploy a nationwide 5G network using DISH's spectrum" with "[a]t least 70% of the U.S. population having access to download speeds" compatible with 5G technology.

58.     In the same letter, EchoStar informed the FCC that it intended to effectuate its "competitive entry into the wireless market" through its "anticipated acquisition of Boost Mobile," which was then a part of Sprint.  Through DISH, EchoStar planned to make Boost Mobile the fourth nationwide wireless carrier, to compete with Verizon, AT&T, and T-Mobile.

59.     EchoStar's acquisition of Boost Mobile closed in July 2020.  As a condition of the transaction, the FCC imposed deadlines by when EchoStar would be required to have its mobile wireless coverage reach certain percentages of the U.S. population and/or geography with its 5G broadband services.  For example, by June 14, 2022, EchoStar was required to offer 5G broadband services to at least 20% of the U.S. population, and, by June 14, 2023, EchoStar was required to extend 5G service to 70% of the U.S. population.[5]

60.     In order to become a major player in the mobile wireless market, DISH required access to spectrum—the invisible, electromagnetic frequencies that transmit wireless signals for services like cellular data and wi-fi.  Spectrum is a finite, scarce resource that is regulated in the

---

[4]     *See* July 26, 2019 Letter from DISH to FCC, https://www.fcc.gov/sites/default/files/dish-letter-07262019.pdf.

[5]     EchoStar's 70% coverage requirement was subject to an automatic two-year extension, until June 14, 2025, if its 5G service reached 50% of the U.S. population by June 14, 2023.

United States by the FCC. Companies can obtain licenses to use specific frequencies of spectrum—measured in megahertz (MHz) and gigahertz (GHz)—for exclusive purposes, including, as relevant here, to provide mobile wireless and data services.

61.     EchoStar invested more than $30 billion in spectrum and related assets, including at FCC-conducted, industry-wide auctions, where it successfully bid for spectrum licenses at various frequencies.[6] Wireless spectrum licenses are regulated by the FCC and are subject to revocation or non-renewal by the Commission depending on a variety of factors, including the scope and quality of the service made available by the wireless provider.

## II.     CROWN CASTLE AND DISH ENTER INTO THE MLA AND MPA

62.     DISH's plan to grow Boost Mobile into the next major wireless player depended upon an accelerated, large-scale deployment of EchoStar's spectrum assets to meet EchoStar's commitments to the FCC.

63.     To do that, DISH required access to cell towers throughout the United States from which it could deploy the equipment necessary to receive and transmit spectrum frequencies and permit mobile devices to access wireless and data service.

64.     In early 2021, EchoStar Executive Vice President of Network Development David Mayo affirmed that "[s]ecuring strong tower partners . . . is tremendously important for DISH's rapid roll-out of a new, nationwide 5G network."[7]

---

[6]     *See* DISH Network Corp., Annual Report (Form 10-K) (Mar. 12, 2025).

[7]     *DISH Expands Nationwide 5G Wireless Infrastructure with Seven New Tower Agreements* (February 16, 2021), https://about.dish.com/2021-02-16-DISH-Expands-Nationwide-5G-Wireless-Infrastructure-with-Seven-New-Tower-Agreements.

65. Crown Castle was the first of DISH's "strong tower partners." Through its affiliates, Crown Castle maintains and operates an extensive network of wireless communications infrastructure, including approximately 40,000 cell tower sites across the United States. Crown Castle leases space on its towers to wireless network carriers, which install equipment on Crown Castle's tower sites to operate their networks.

### A. The Master Lease Agreement

66. DISH became one of Crown Castle's tower "tenants" when it executed the MLA with Crown Castle's lessors on November ███ 2020. ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████ A copy of the MLA is attached hereto as **Exhibit A**.[8]

67. Upon signing the MLA, DISH celebrated "[t]he announcement of Crown Castle as our first tower partner" as "an important milestone for DISH as we set our sights on building a first of its kind 5G network in the U.S."[9] DISH recognized that "Crown Castle brings the experience and broad tower portfolio we need, from major markets to more rural areas, to help DISH bring to life the promise of our standalone, nationwide 5G network."

██  ████████████████████████████████████████

███████████████████████████████████████████

---

[8]    Pursuant to the confidentiality provisions in the MLA and MPA, both Agreements were filed under restriction, with a motion to restrict forthcoming under Local Rule 7.2.

[9]    *DISH Signs Multi-Year Anchor Tenant Tower Agreement with Crown Castle* (Nov. 16, 2020), https://www.prnewswire.com/news-releases/dish-signs-multi-year-anchor-tenant-tower-agreement-with-crown-castle-301173532.html.



**B.  The Master Product Agreement**

72.    Crown Castle and DISH also entered into the MPA, an agreement affording DISH

access to fiber products and data center services to support and facilitate the development of the

DISH network.  Crown Castle and DISH executed the MPA on December ▇, 2020.[10] ▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

A copy of the MPA is attached hereto as **Exhibit B.**

▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇

▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[10]    The MPA was amended on November ▇, 2022 and July ▇, 2024.

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

### III. ECHOSTAR SELLS CERTAIN OF ITS SPECTRUM LICENSES TO AT&T AND SPACEX FOR BILLIONS OF DOLLARS

76.     DISH's 5G buildout faltered following its execution of the MLA and MPA. DISH failed to meet several spectrum license buildout commitments that EchoStar had made to the FCC, and its network utilization lagged behind its commitments. In its Form 10-K filed with the U.S. Securities and Exchange Commission (the "SEC") for Fiscal Year 2023, DISH Network Corporation disclosed that it had not met certain of its FCC coverage requirements for that year, triggering an extension for it to meet the prerequisites for a significant portion of its available spectrum.

77.     Following the December 31, 2023 merger with EchoStar, EchoStar wrote the FCC in September 2024—on joint EchoStar and DISH letterhead—requesting an extension of certain of its forthcoming buildout deadlines set for 2025, noting that there was "still more that EchoStar needs to do" in order for it to become "the competitive fourth facilities-based carrier" in the mobile wireless industry.[11] The FCC agreed to the extension request.

78.     In May 2025, however, the FCC initiated an inquiry into EchoStar's continued underutilization of its licensed spectrum. On May 9, 2025, FCC Chairman Brendan Carr informed EchoStar by letter that he had "directed agency staff to begin a review of EchoStar's compliance

---

[11]    *See* September 18, 2024 Letter from DISH to Federal Communications Commission, https://www.fcc.gov/ecfs/document/1091867842711/1.

with its federal obligations to provide 5G service throughout the United States per the terms of its

federal spectrum licenses."[12]

79.     The risk that DISH could face adverse action by the FCC affecting its access to

spectrum licenses was not only foreseeable, but was a risk known by DISH at the time it entered

into the MLA and MPA.  DISH Network Corporation's Form 10-K for the year ending December

31, 2019, for example, disclosed the following risk factors:

- "Wireless services and our wireless spectrum licenses are subject to regulation by the FCC and other federal, state and local, as well as international, governmental authorities.  These governmental authorities could adopt regulations or take other actions that would adversely affect our business prospects, making it more difficult and/or expensive to commercialize our wireless spectrum licenses or acquire additional licenses."

- "The FCC grants wireless licenses for terms of generally ten years that are subject to renewal or revocation based on certain factors depending on the license including, among others, public interest considerations, level and quality of services and/or operations provided by the licensee, frequency and duration of any interruptions or outages of services and/or operations provided by the licensee, and the extent to which service is provided to, and/or operation is provided in, rural areas and tribal lands."

- "Failure to comply with FCC requirements in a given license area could result in revocation of the license for that license area."

80.     In response to Chairman Carr's letter, EchoStar has repeatedly denied that the FCC

had any basis to take adverse action with respect to its spectrum licenses.  For example, in an FCC

filing made on June 6, 2025, EchoStar stated that any attempt by the FCC to disrupt or otherwise

---

[12]     *See* Form 8-K, EchoStar Corporation dated May 13, 2025 (enclosing Chairman Carr's May 9, 2025 Letter).

revoke EchoStar's spectrum licenses would be "unlawful, unconstitutional, discriminatory, and utterly baseless."[13]

81.    EchoStar could have continued to contest the FCC's ability to take any adverse action relating to its spectrum licenses. It chose instead to sell them.

82.    Specifically, on August 26, 2025, EchoStar announced a definitive agreement to sell certain of its spectrum licenses—in the 3.45 GHz and 600 MHz frequencies—to AT&T for approximately $23 billion (the "AT&T Transaction"). The AT&T Transaction is expected to close, subject to regulatory approvals, in 2026.

83.    Two weeks later, on September 8, 2025, EchoStar announced that it entered into a second agreement, this time with SpaceX, to sell additional spectrum licenses—in the AWS-4 and H-block frequencies—for approximately $17 billion (the "SpaceX Transaction"). The SpaceX Transaction is also expected to close in 2026, subject to regulatory approvals.

84.    On November 6, 2025, EchoStar announced that it had entered into a second definitive agreement with SpaceX, to sell additional spectrum licenses for approximately $2.6 billion. This transaction, similar to the first SpaceX Transaction, is also expected to close in 2026, subject to regulatory approvals.

85.    At no point was EchoStar ordered—by the FCC or any other government regulator or court—to enter into the AT&T and SpaceX Transactions or to dispose of the spectrum licenses.

---

[13]    *See* Reply Comments of EchoStar Corporation, *In the Matter of Space Bureau Opens New Docket to Explore EchoStar Corporation's Use of 2 GHz MSS Spectrum*, SB Docket No. 25-173 before the Federal Communications Commission.

86.     Indeed, on a public "strategy call" hosted by EchoStar on September 15, 2025,
EchoStar's Chairman Ergen made clear that the spectrum licenses were not sold in any sort of fire
sale but instead at a "market price."[14]  AT&T's CEO Dan Meyer similarly stated that he was "well
aware that what [AT&T is] paying is more than what [EchoStar] paid for spectrum at auction."
Public reporting has estimated that AT&T is paying a *$7 billion premium* over what DISH paid
to acquire the spectrum licenses it sold.[15]  As Mr. Ergen put it on the September 15 call, the
Transactions would make EchoStar "cash-rich."

87.     After the AT&T and SpaceX Transactions close, DISH plans to transition to
become a hybrid Mobile Virtual Network Operator, meaning that instead of providing its own
physical network infrastructure like other wireless providers (including Verizon, AT&T, and T-
Mobile), DISH apparently will lease network capacity from those providers, and sell mobile
services under its Boost Mobile brand.

## IV.     DISH BASELESSLY ASSERTS A FORCE MAJEURE HAS OCCURRED

88.     Soon after EchoStar entered into the AT&T Transaction and the SpaceX
Transaction, DISH embarked upon a campaign to avoid paying its vendors and other partners who
supported the buildout of its wireless network.[16]

---

[14]     *EchoStar Corporation (SATS) Discusses on Pioneering What's Next: EchoStar's Vision And Strategy Call (Transcript)*, Seeking Alpha (Sept. 15, 2025), https://seekingalpha.com/article/4822911-echostar-corporation-sats-discusses-on-pioneering-whats-next-echostars-vision-and-strategy-call-transcript.

[15]     *E.g.*, *AT&T CEO admits to high price for EchoStar spectrum*, SDxCentral (Sept. 3, 2025), https://www.sdxcentral.com/news/att-ceo-admits-to-high-price-for-echostar-spectrum/.

[16]     *See, e.g.*, *Multiple Contractors Allege They're Being Pressured to Accept Deep Discounts on Completed Work for DISH* (Oct. 13, 2025), https://wirelessestimator.com/articles/2025/multiple-contractors-allege-theyre-being-pressured-to-accept-deep-discounts-on-completed-work-for-dish/.

89.     On September 24 and 25, 2025, DISH sent two, nearly identical notices to Crown

Castle (the "September Notices"), claiming that a force majeure had occurred.[17]  Notwithstanding

that assertion, DISH also stated "DISH Wireless needs to continue to operate certain [tower]

Sites . . . for a period of time."

90.     The supposed force majeure event claimed by DISH has no support in the

Agreements and is belied by EchoStar's public statements to its investors, the FCC, and the SEC.

91.     In the September Notices, DISH asserted that "EchoStar needed to sell certain

spectrum licenses or face a wide-ranging license revocation by the FCC" and that DISH was forced

"to abandon its longstanding business plan for Boost Mobile."  *See* **Exhibit C** (September 24,

2025 MLA Letter); **Exhibit D (**September 25, 2025 MPA Letter).  As a result, DISH claimed, the

AT&T and SpaceX Transactions were the result of "unforeseeable actions by the FCC taken

outside of DISH Wireless's control" and "constitute one or more events of Force Majeure" as

defined in the MPA and MLA.  *See id.*  None of these statements are true, and, even if they were,

the events they describe would not constitute force majeure under the Agreements.

92.     Contrary to DISH's claims that EchoStar was forced to sell wireless spectrum or

face a "revocation" of its licenses, EchoStar had repeatedly and publicly rejected that position,

telling its investors and regulators, among other things, that any revocation by the FCC would be

"unlawful, unconstitutional, discriminatory, and utterly baseless"; that it did not believe the FCC

---

[17]     Although DISH apparently sent the September 25 notice by mail, Crown Castle did not
receive it.  DISH ultimately received the notice by email on November 6, 2025.

could revoke its licenses; that EchoStar had "met or exceeded" all of its buildout commitments to the FCC; and that EchoStar "would win" any "battle" with the FCC.[18]

93.    Nor did the FCC "force" EchoStar or DISH to take any action.  At no time did the FCC order EchoStar to sell its spectrum licenses.  Instead, the AT&T and SpaceX Transactions are the result of business decisions entirely within the control of DISH and its affiliates.  As Mr. Ergen has acknowledged, the Transactions reflect a "market price" for EchoStar's spectrum licenses.  *Supra* ¶ 86.

94.    Further, the events that precipitated the FCC's inquiry—DISH's alleged underutilization of licensed spectrum—were entirely foreseeable and within the power of DISH and EchoStar to avoid.  Indeed, DISH Network Corporation's SEC filings foresaw and recognized the risk that its spectrum licenses could be subject to revocation for various reasons, including the level, quality, and extent of the mobile wireless service DISH offered.  *Supra* ¶ 79.  The success or failure of DISH's efforts to expand its subscriber base and the reach of its network were entirely within DISH's own power to control.

95.    Nor have the AT&T and SpaceX Transactions left DISH unable to perform under the MLA and MPA.  EchoStar has publicly acknowledged that the Transactions have "kept [EchoStar] in a marketplace in a very aggressive way without any limitations to grow and

---

[18]    *See supra* ¶ 80 at n.13; *see also EchoStar Corporation (SATS) Discusses on Pioneering What's Next: EchoStar's Vision And Strategy Call (Transcript)*, Seeking Alpha (Sept. 15, 2025),   https://seekingalpha.com/article/4822911-echostar-corporation-sats-discusses-on-pioneering-whats-next-echostars-vision-and-strategy-call-transcript;   *FCC questions EchoStar about how it's using 5G spectrum*, Fierce Network (May 12, 2025), https://www.fierce-network.com/wireless/fcc-questions-echostar-about-how-its-using-5g-spectrum.

compete," that EchoStar continues to hold spectrum licenses, and that Boost Mobile still has a "great subscriber base in the marketplace" and intends to continue to be a "challenger brand" and "disruptive player" in the mobile wireless industry.[19]  Mr. Ergen has touted that the Transactions will leave EchoStar "cash-rich" and that Boost Mobile will be "way more competitive" as a "growth business" with a new business model.[20]  Although DISH has voluntarily changed its business strategy, it remains more than capable of paying Crown Castle what is owed under the Agreements.[21]

96.    The parties' disputes under the MLA and MPA are ripe and appropriate for resolution by declaratory judgment.  In an October 9, 2025 letter, DISH asserted again that a force majeure had been triggered under the MLA, which it claimed "will not be eliminated within 180 days after the onset of such condition."  A true and correct copy of DISH's October 9 letter is attached as **Exhibit E**.

97.    In letters to DISH dated October 24, 2025 and November 14, 2025, Crown Castle rejected DISH's assertion that a force majeure had occurred and made clear that DISH remains obligated to perform under the MLA and MPA.  True and correct copies of these letters are attached as **Exhibit F** and **Exhibit G**.

---

[19]    *EchoStar Corporation (SATS) Discusses on Pioneering What's Next: EchoStar's Vision And Strategy Call (Transcript)*, Seeking Alpha (Sept. 15, 2025), https://seekingalpha.com/article/4822911-echostar-corporation-sats-discusses-on-pioneering-whats-next-echostars-vision-and-strategy-call-transcript.

[20]    *See id.*

[21]    Crown Castle is not the only DISH counterparty subjected to DISH's efforts to evade its obligations.  DISH similarly has sought to exit its lease agreement with Crown Castle's competitor, American Tower, claiming that the purpose of that agreement was "frustrated" as a result of the Transactions.

98.     On November 18, 2025, Crown Castle received a letter from DISH dated November 10, 2025 in which DISH continued to assert that "DISH Wireless has been subject to actions by the [FCC] that constitute an event of Force Majeure and that frustrate the purpose of the [MLA]," claiming again that the purportedly "entirely unforeseeable" actions by the FCC left EchoStar with "no choice but to sell or forfeit spectrum that DISH Wireless needs to operate its 5G network." A true and correct copy of this letter is attached as **Exhibit H**.

99.     As of the date of this filing, DISH continues to maintain that a force majeure has occurred.

100.    At all times, Crown Castle has acted in good faith and has honored its obligations under the MLA and MPA.

101.    Based on the foregoing, an actual controversy exists between Crown Castle and DISH regarding the parties' rights and obligations under the MLA and MPA, whether a force majeure has in fact occurred under either Agreement, and whether DISH remains obligated to perform its obligations thereunder.

102.    Accordingly, Crown Castle is entitled to a declaration confirming that a force majeure has not occurred under either the MLA or the MPA, that DISH is not excused from performing its obligations under either Agreement, that both the MLA and MPA remain in full force and effect, and that DISH remains obligated to perform all of its obligations thereunder.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment that a Force Majeure Has Not Occurred Under the MLA)

103.    Crown Castle incorporates the foregoing allegations by reference.

104.    On November ▮, 2020, Crown Castle and DISH entered into the MLA.

105.    Under the terms of the MLA, ████████████████████████████

████████████████████████████████████████

106.    On September 24, 2025, DISH purported to notify Crown Castle that, as a result of the FCC's recent inquiry and the planned closings of the AT&T and SpaceX Transactions, a force majeure had occurred as defined in the MLA.

107.    That notice was baseless under the MLA and contrary to the requirements for force majeure under controlling Colorado law.



109.    None of the events described by DISH constitute a force majeure under the MLA.

110.    An actual and substantial controversy exists between the parties regarding their rights and obligations under the MLA, including whether a force majeure event has occurred under that Agreement and whether DISH remains obligated to perform its forthcoming payment obligations under the MLA.  This controversy is immediate, real, ongoing and justiciable.

111.    Pursuant to 28 U.S.C. §§ 2201 and 2202, Crown Castle is entitled to a declaration confirming that no force majeure has occurred under the MLA, that DISH is not excused from performing any of its obligations thereunder, and that the MLA remains in full force and effect.

112.    Such declaration would resolve the present controversy.

## SECOND CLAIM FOR RELIEF

**(Declaratory Judgment that a Force Majeure Has Not Occurred Under the MPA)**

113.    Crown Castle incorporates the foregoing allegations by reference.

114.    On December ▮, 2020, Crown Castle and DISH entered into the MPA.

115.    Under the terms of the MPA, ████████████████████████████████

████████████████████████████

116.    On September 25, 2025, DISH purported to notify Crown Castle that, as a result of the FCC's recent inquiry and the planned closings of the AT&T and SpaceX Transactions, a force majeure had occurred as defined in the MPA.

117.    That notice was baseless under the MPA and contrary to controlling Colorado law.



119.    None of the events described by DISH constitute a force majeure under the MPA.

120.    An actual and substantial controversy exists between the parties regarding their rights and obligations under the MPA, including whether a force majeure event has occurred under that Agreement and whether DISH remains obligated to perform its forthcoming payment obligations under the MPA.  This controversy is immediate, real, ongoing and justiciable.

121.    Pursuant to 28 U.S.C. §§ 2201 and 2202, Crown Castle is entitled to a declaration confirming that no force majeure has occurred under the MPA, that DISH is not excused from performing any of its obligations thereunder, and that the MPA remains in full force and effect.

122.    Such declaration would resolve the present controversy.

**PRAYER FOR RELIEF**

WHEREFORE, Crown Castle is entitled to a judgment against DISH:

    a.    Declaring that:  (i) no force majeure has occurred under the MLA; (ii)  DISH is not excused from performing its obligations under the MLA; (iii) the MLA remains in full force and effect; and (iv) DISH remains obligated to perform all of its obligations under the MLA;

    b.    Declaring that:  (i) no force majeure has occurred under the MPA; (ii)  DISH is not excused from performing its obligations under the MPA; (iii) that the MPA remains in full force and effect; and (iv) DISH remains obligated to perform all of its obligations under the MPA;

    c.    Awarding Crown Castle its costs in this action as well as reasonable attorneys' fees; and

    d.    Awarding any other relief as the Court deems just and proper.

Dated: November 20, 2025

Respectfully submitted,

By: */s/ Laura A. Menninger*
Laura A. Menninger
HADDON MORGAN FOREMAN
945 N. Pennsylvania Street
Denver, CO 80203
Tel: (303) 831-7364
E-mail: lmenninger@hmflaw.com

Jay Cohen (admission forthcoming)
Jeffrey J. Recher (admission forthcoming)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990
E-mail: jaycohen@paulweiss.com
        jrecher@paulweiss.com

*Counsel for Plaintiffs Aircomm of Avon, LLC; Atlantic Coast Communications LLC; CCATT LLC; CCTMO LLC; CCTM1 LLC; CCTM2 LLC; Coverage Plus Antenna Systems LLC; Crown Atlantic Company LLC; Crown Castle Fiber LLC; Crown Castle GT Company LLC; Crown Castle MU LLC; Crown Castle South LLC; Crown Castle Towers 05 LLC; Crown Castle Towers 06-2 LLC; Crown Castle Towers 09 LLC; Crown Communication LLC; Global Signal Acquisitions LLC; Global Signal Acquisitions II LLC; Global Signal Acquisitions III LLC; Global Signal Acquisitions IV LLC; GoldenState Towers, LLC; High Point Management Co. LLC; ICB Towers, LLC; Interstate Tower Communications LLC; IntraCoastal City Towers LLC; Pinnacle Towers Acquisition LLC; Pinnacle Towers Asset Holding LLC; Pinnacle Towers LLC; Pinnacle Towers III LLC; Radio Station WGLD LLC; Shaffer & Associates, Inc.; Sierra Towers, Inc.; Tower Development Corporation; Tower Systems LLC; Tower Technology Company of Jacksonville LLC;*

*Tower Ventures III, LLC; WCP Wireless Lease Subsidiary, LLC; and TVHT, LLC.*