**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| Aircomm of Avon, LLC; Atlantic Coast Communications LLC; CCATT LLC; CCTMO LLC; CCTM1 LLC; CCTM2 LLC; Coverage Plus Antenna Systems LLC; Crown Atlantic Company LLC; Crown Castle Fiber LLC; Crown Castle GT Company LLC; Crown Castle MU LLC; Crown Castle South LLC; Crown Castle Towers 05 LLC; Crown Castle Towers 06-2 LLC; Crown Castle Towers 09 LLC; Crown Castle USA Inc.; Crown Communication LLC; Global Signal Acquisitions LLC; Global Signal Acquisitions II LLC; Global Signal Acquisitions III LLC; Global Signal Acquisitions IV LLC; GoldenState Towers, LLC; High Point Management Co. LLC; ICB Towers, LLC; Interstate Tower Communications LLC; IntraCoastal City Towers LLC; Pinnacle Towers Acquisition LLC; Pinnacle Towers Asset Holding LLC; Pinnacle Towers LLC; Pinnacle Towers III LLC; Radio Station WGLD LLC; Shaffer & Associates, Inc.; Sierra Towers, Inc.; Tower Development Corporation; Tower Systems LLC; Tower Technology Company of Jacksonville LLC; Tower Ventures III, LLC; WCP Wireless Lease Subsidiary, LLC; and TVHT, LLC, | Civil Action No. 1:25-cv-03756-NYW-CYC <br><br> **Jury Trial Demanded** |
| Plaintiffs, | |
| v. | |
| DISH Wireless L.L.C.; DISH Purchasing Corporation; and EchoStar Corporation, | |
| Defendants. | |

**FIRST AMENDED COMPLAINT**

Plaintiffs Aircomm of Avon, LLC; Atlantic Coast Communications LLC; CCAT LLC; CCTMO LLC; CCTM1 LLC; CCTM2 LLC; Coverage Plus Antenna Systems LLC; Crown Atlantic Company LLC; Crown Castle Fiber LLC; Crown Castle GT Company LLC; Crown Castle MU LLC; Crown Castle South LLC; Crown Castle Towers 05 LLC; Crown Castle Towers 06-2 LLC; Crown Castle Towers 09 LLC; Crown Castle USA Inc.; Crown Communication LLC; Global Signal Acquisitions LLC; Global Signal Acquisitions II LLC; Global Signal Acquisitions III LLC; Global Signal Acquisitions IV LLC; GoldenState Towers, LLC; High Point Management Co. LLC; ICB Towers, LLC; Interstate Tower Communications LLC; IntraCoastal City Towers LLC; Pinnacle Towers Acquisition LLC; Pinnacle Towers Asset Holding LLC; Pinnacle Towers LLC; Pinnacle Towers III LLC; Radio Station WGLD LLC; Shaffer & Associates, Inc.; Sierra Towers, Inc.; Tower Development Corporation; Tower Systems LLC; Tower Technology Company of Jacksonville LLC; Tower Ventures III, LLC; WCP Wireless Lease Subsidiary, LLC; and TVHT, LLC (collectively, "Crown Castle" or "Plaintiffs"), by and through undersigned counsel, file this First Amended Complaint against DISH Wireless L.L.C. ("DISH"), DISH Purchasing Corporation ("DISH Purchasing"), and EchoStar Corporation ("EchoStar") and allege as follows:

## INTRODUCTION

1.      DISH is a mobile wireless carrier available to consumers through its Boost Mobile brand.  It entered the mobile wireless market in 2019 and sought to build a nationwide, 5G mobile wireless network.  DISH contracted with Crown Castle, one of the nation's leading owners and operators of shared communications infrastructure, to secure critical access to that infrastructure as part of its buildout.

2.     This action arises out of an effort by DISH and its parent, EchoStar, to intentionally repudiate DISH's long-term contractual commitments to Crown Castle.  They attempt to do so by asserting, without any factual or legal basis, a force majeure event stemming from EchoStar's forthcoming sale of wireless spectrum that it had acquired from the U.S. government to create a nationwide wireless carrier.  Contrary to DISH's and EchoStar's claim, there has been no unexpected or unforeseeable event outside of DISH's control that precludes DISH from fulfilling its contractual commitments to pay Crown Castle all amounts owed under the agreements at issue.  To the contrary, all that has happened is that EchoStar made a voluntary decision to sell its wireless spectrum—for *more than $40 billion*—apparently obviating DISH's need for the infrastructure it has contracted for with Crown Castle once those sales are consummated.  That business decision is the ***antithesis*** of force majeure.

3.     DISH and EchoStar have deployed that fiction as part of a scheme to enrich EchoStar, while refusing to pay Crown Castle and DISH's other infrastructure vendors what they are owed under their binding contracts.  Crown Castle made its tower and other infrastructure available to DISH on a long-term basis so that EchoStar could fulfill the promises it made to the U.S. government when it obtained wireless spectrum to turn DISH into a nationwide wireless carrier—spectrum that EchoStar is now planning to sell for billions of dollars, while trying to stiff Crown Castle and DISH's other vendors that facilitated the creation of DISH's wireless network.

4.     EchoStar is the architect of this scheme, and is the driving force behind DISH's effort to repudiate contractual commitments made to ***dozens*** of infrastructure and other service providers.  As it pertains to Crown Castle, EchoStar has caused DISH to make baseless assertions of force majeure or similar doctrines purportedly based on the false claim that the Federal

Communications Commission (the "FCC") compelled EchoStar to sell its spectrum.  But the indisputable facts show that the decision by EchoStar to sell its spectrum was a voluntary one, and, in any event, could not constitute a force majeure because the parties' agreements ██████████ ███████████████████████████████████████████████ DISH may no longer need the towers it leased from Crown Castle, but it is contractually obligated to meet its obligations under the parties' agreements.

5.      Moreover, EchoStar has apparently structured its spectrum sales to ensure that DISH will be rendered financially unable to satisfy its commitments to Crown Castle and other contractual counterparties.  As DISH has told Crown Castle, DISH "is not entitled to any of the spectrum sale proceeds at closing."  The implication of DISH's statement is clear:  EchoStar and DISH intend to walk away from their commitments, and then have DISH threaten to file or file for bankruptcy, all in an effort to leave DISH's vendors holding the bag while EchoStar walks away with billions of dollars when the contemplated sales of spectrum are completed.

6.      Crown Castle is entitled to a declaratory judgment that EchoStar's spectrum sales do not provide a legal basis for DISH to avoid its contractual obligations.  Since Crown Castle filed this action, DISH has ceased performing under the agreements.  Starting in December 2025, DISH has withheld ███████████████ in contractually required payments owed to Crown Castle.  As a result, Crown Castle has exercised its contractual right to terminate DISH's use of over 12,000 of its tower sites.  Under the parties' agreement, DISH's default has the effect of ████████████████████████ over $3.5 billion in future contractual payment obligations.  Crown Castle now seeks to recover these amounts, as well as damages for other contractual breaches by DISH and its affiliates.  In addition, EchoStar's role in this scheme

constitutes tortious interference with Crown Castle's relationship with DISH, for which EchoStar must be held liable.

## PARTIES

7.      Aircomm of Avon, LLC is a signatory to the Master Lease Agreement with DISH (the "MLA").  Aircomm of Avon, LLC is a Connecticut company with its principal place of business in Houston, Texas.

8.      Atlantic Coast Communications LLC is a signatory to the MLA.  Atlantic Coast Communications LLC is a Delaware company with its principal place of business in Houston, Texas.

9.      CCATT LLC is a signatory to the MLA.  CCATT LLC is a Delaware company with its principal place of business in Houston, Texas.

10.     CCTMO LLC is a signatory to the MLA.  CCTMO LLC is a Delaware company with its principal place of business in Houston, Texas.

11.     CCTM1 LLC is a signatory to the MLA.  CCTM1 LLC is a Delaware company with its principal place of business in Houston, Texas.

12.     CCTM2 LLC is a signatory to the MLA.  CCTM2 LLC is a Delaware company with its principal place of business in Houston, Texas.

13.     Coverage Plus Antenna Systems LLC is a signatory to the MLA.[1]  Coverage Plus Antenna Systems LLC is a Delaware company with its principal place of business in Houston, Texas.

---

[1]      The MLA identifies this lessor as Coverage Plus Systems LLC instead of Coverage Plus Antenna Systems LLC.

14.     Crown Atlantic Company LLC is a signatory to the MLA.  Crown Atlantic Company LLC is a Delaware company with its principal place of business in Houston, Texas.

15.     Crown Castle GT Company LLC is a signatory to the MLA.  Crown Castle GT Company LLC is a Delaware company with its principal place of business in Houston, Texas.

16.     Crown Castle MU LLC is a signatory to the MLA.  Crown Castle MU LLC is a Delaware company with its principal place of business in Houston, Texas.

17.     Crown Castle South LLC is a signatory to the MLA.  Crown Castle South LLC is a Delaware company with its principal place of business in Houston, Texas.

18.     Crown Castle Towers 05 LLC is a signatory to the MLA.  Crown Castle Towers 05 LLC is a Delaware company with its principal place of business in Houston, Texas.

19.     Crown Castle Towers 06-2 LLC is a signatory to the MLA.  Crown Castle Towers 06-2 LLC is a Delaware company with its principal place of business in Houston, Texas.

20.     Crown Castle Towers 09 LLC is a signatory to the MLA.  Crown Castle Towers 09 LLC is a Delaware company with its principal place of business in Houston, Texas.

21.     Crown Castle USA Inc. is a signatory to the Deployment Services Agreement (the "DSA") with DISH Purchasing.  Crown Castle USA Inc. is a Pennsylvania company with its principal place of business in Canonsburg, Pennsylvania.

22.     Crown Communication LLC is a signatory to the MLA.  Crown Communication LLC is a Delaware company with its principal place of business in Houston, Texas.

23.     Global Signal Acquisitions LLC is a signatory to the MLA.  Global Signal Acquisitions LLC is a Delaware company with its principal place of business in Houston, Texas.

24.     Global Signal Acquisitions II LLC is a signatory to the MLA.  Global Signal Acquisitions II LLC is a Delaware company with its principal place of business in Houston, Texas.

25.     Global Signal Acquisitions III LLC is a signatory to the MLA.  Global Signal Acquisitions III LLC is a Delaware company with its principal place of business in Houston, Texas.

26.     Global Signal Acquisitions IV LLC is a signatory to the MLA.  Global Signal Acquisitions IV LLC is a Delaware company with its principal place of business in Houston, Texas.

27.     GoldenState Towers, LLC is a signatory to the MLA.  GoldenState Towers, LLC is a Delaware company with its principal place of business in Houston, Texas.

28.     High Point Management Co. LLC is a signatory to the MLA.  High Point Management Co. LLC is a Delaware company with its principal place of business in Houston, Texas.

29.     ICB Towers, LLC is a signatory to the MLA.  ICB Towers, LLC is a Georgia company with its principal place of business in Houston, Texas.

30.     Interstate Tower Communications LLC is a signatory to the MLA.  Interstate Tower Communications LLC is a Delaware company with its principal place of business in Houston, Texas.

31.     IntraCoastal City Towers LLC is a signatory to the MLA.  IntraCoastal City Towers LLC is a Delaware company with its principal place of business in Houston, Texas.

32.     Pinnacle Towers Acquisition LLC is a signatory to the MLA.  Pinnacle Towers Acquisition LLC is a Delaware company with its principal place of business in Houston, Texas.

33.     Pinnacle Towers Asset Holding LLC is a signatory to the MLA.  Pinnacle Towers Asset Holding LLC is a Delaware company with its principal place of business in Houston, Texas.

34.     Pinnacle Towers LLC is a signatory to the MLA.  Pinnacle Towers LLC is a Delaware company with its principal place of business in Houston, Texas.

35.     Pinnacle Towers III LLC is a signatory to the MLA.  Pinnacle Towers III LLC is a Delaware company with its principal place of business in Houston, Texas.

36.     Radio Station WGLD LLC is a signatory to the MLA.  Radio Station WGLD LLC is a Delaware company with its principal place of business in Houston, Texas.

37.     Shaffer & Associates, Inc. is a signatory to the MLA.  Shaffer & Associates, Inc. is an Illinois company with its principal place of business in Houston, Texas.

38.     Sierra Towers, Inc. is a signatory to the MLA.  Sierra Towers, Inc. is a Texas company with its principal place of business in Houston, Texas.

39.     Tower Development Corporation is a signatory to the MLA.  Tower Development Corporation is a Maryland company with its principal place of business in Houston, Texas.

40.     Tower Systems LLC is a signatory to the MLA.  Tower Systems LLC is a Delaware company with its principal place of business in Houston, Texas.

41.     Tower Technology Company of Jacksonville LLC is a signatory to the MLA. Tower Technology Company of Jacksonville LLC is a Delaware company with its principal place of business in Houston, Texas.

42.     Tower Ventures III, LLC is a signatory to the MLA.  Tower Ventures III, LLC is a Tennessee company with its principal place of business in Houston, Texas.

43.     TVHT, LLC is a signatory to the MLA.  TVHT, LLC is a Tennessee company with its principal place of business in Houston, Texas.

44.     WCP Wireless Lease Subsidiary, LLC is a signatory to the MLA.  WCP Wireless Lease Subsidiary, LLC is a Delaware company with its principal place of business in Houston, Texas.

45.     Crown Castle Fiber LLC is a signatory to the Master Product Agreement with DISH (the "MPA").  Crown Castle Fiber LLC is a New York company with its principal place of business in Houston, Texas.

46.     Defendant DISH Wireless L.L.C. is a Colorado limited liability company with its principal place of business in Englewood, Colorado.  DISH provides wireless, voice and data services in the United States.  DISH is an indirect, wholly owned subsidiary of DISH Network Corporation, which merged with EchoStar Corporation in 2023.  DISH is a signatory to both the MLA and the MPA.

47.     Defendant DISH Purchasing Corporation is a Colorado corporation with its principal place of business in Englewood, Colorado.  DISH Purchasing is an indirect, wholly owned subsidiary of DISH Network Corporation, which merged with EchoStar Corporation in 2023.  DISH Purchasing is a signatory to the DSA with Crown Castle USA Inc.

48.     Defendant EchoStar Corporation is a Nevada corporation that is headquartered in Englewood, Colorado.  EchoStar is currently the ultimate parent of DISH and DISH Purchasing.

## JURISDICTION AND VENUE

49.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(a) because complete diversity of citizenship exists between the parties and the amount in

controversy exceeds $75,000 exclusive of interest and costs.

50.     This Court has general and specific personal jurisdiction over DISH, DISH

Purchasing, and EchoStar.  The exercise of general personal jurisdiction is proper because DISH,

DISH Purchasing, and EchoStar are each headquartered in this District, maintaining their principal

places of business in Englewood, Colorado.  The exercise of specific personal jurisdiction is proper

because the claims in this action arise out of and relate to DISH, DISH Purchasing, and EchoStar's

conduct and activities within this District.

51.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because DISH,

DISH Purchasing, and EchoStar reside in this District.

██  ██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

## FACTUAL BACKGROUND

**I.     ECHOSTAR ACQUIRES BOOST MOBILE AND ENTERS THE MOBILE
         WIRELESS BUSINESS IN 2019**

53.     DISH is the mobile and 5G network arm of EchoStar.  DISH is a mobile wireless

carrier, available to consumers through its Boost Mobile brand.

54.     DISH Network Corporation (which merged with EchoStar in 2023) entered the wireless market in 2019 and sought to build a nationwide, 5G mobile wireless network.  In July 2019, EchoStar informed the FCC of its "Nationwide 5G Broadband Commitment," under which it "plan[ned] to deploy a first-of-its-kind 5G network built from the ground up with an architecture that can take full advantage of expected 5G functionality."[2]  EchoStar further advised the FCC that it was ready to "commit to concrete milestones related to its 5G deployment," including that by June 14, 2023, it would "deploy a nationwide 5G network using DISH's spectrum" with "[a]t least 70% of the U.S. population having access to download speeds" compatible with 5G technology.

55.     In the same letter, EchoStar informed the FCC that it intended to effectuate its "competitive entry into the wireless market" through its "anticipated acquisition of Boost Mobile," which was then a part of Sprint.  Through DISH, EchoStar planned to make Boost Mobile the fourth nationwide wireless carrier, to compete with Verizon, AT&T, and T-Mobile.

56.     EchoStar's acquisition of Boost Mobile closed in July 2020.  As a condition of the transaction, the FCC imposed deadlines by when EchoStar would be required to have its mobile wireless coverage reach certain percentages of the U.S. population and/or geography with its 5G broadband services.  For example, by June 14, 2022, EchoStar was required to offer 5G broadband services to at least 20% of the U.S. population, and, by June 14, 2023, EchoStar was required to extend 5G service to 70% of the U.S. population.[3]

---

[2]     *See* July 26, 2019 Letter from DISH to FCC, https://www.fcc.gov/sites/default/files/dish-letter-07262019.pdf.

[3]     EchoStar's 70% coverage requirement was subject to an automatic two-year extension, until June 14, 2025, if its 5G service reached 50% of the U.S. population by June 14, 2023.

57.     In order to become a major player in the mobile wireless market, DISH required access to spectrum—the invisible, electromagnetic frequencies that transmit wireless signals for services like cellular data and Wi-Fi.  Spectrum is a finite, scarce resource that is regulated in the United States by the FCC.  Companies can obtain licenses to use specific frequencies of spectrum—measured in megahertz (MHz) and gigahertz (GHz)—for exclusive purposes, including, as relevant here, to provide mobile wireless and data services.

58.     EchoStar invested more than $30 billion in spectrum and related assets, including at FCC-conducted, industry-wide auctions, where it successfully bid for spectrum licenses at various frequencies.[4]  Wireless spectrum licenses are regulated by the FCC and are subject to revocation or non-renewal by the Commission depending on a variety of factors, including the scope and quality of the service made available by the wireless provider.

59.     DISH utilized the spectrum licenses purchased by EchoStar to build out its 5G network.

## II.    CROWN CASTLE AND DISH ENTER INTO A SERIES OF CONTRACTS

60.     DISH's plan to grow Boost Mobile into the next major wireless player depended upon an accelerated, large-scale deployment of EchoStar's spectrum assets to meet EchoStar's commitments to the FCC.

61.     To do that, DISH required access to cell towers throughout the United States from which it could deploy the equipment necessary to receive and transmit spectrum frequencies and permit mobile devices to access wireless and data service.

---

[4]     *See* DISH Network Corp., Annual Report (Form 10-K) (Mar. 12, 2025), at 2.

62.     In early 2021, EchoStar Executive Vice President of Network Development David Mayo affirmed that "[s]ecuring strong tower partners . . . is tremendously important for DISH's rapid roll-out of a new, nationwide 5G network."[5]  Crown Castle was the first of DISH's "strong tower partners."  Through its affiliates, Crown Castle maintains and operates an extensive network of wireless communications infrastructure, including approximately 40,000 cell tower sites and more than 90,000 route miles of fiber across the United States.  Crown Castle leases space on its towers to wireless network carriers, which install equipment on Crown Castle's tower sites to operate their networks.

### A. The Master Lease Agreement

63.     DISH became one of Crown Castle's tower "tenants" when it executed the MLA with Crown Castle's lessors.[6]  The MLA was effective as of November ██, 2020.  ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████  A copy of the MLA is attached hereto as **Exhibit A**.[7]

64.     Upon signing the MLA, DISH celebrated "[t]he announcement of Crown Castle as [its] first tower partner" as "an important milestone for DISH as we set our sights on building a

---

[5]     *DISH Expands Nationwide 5G Wireless Infrastructure with Seven New Tower Agreements* (February 16, 2021), https://about.dish.com/2021-02-16-DISH-Expands-Nationwide-5G-Wireless-Infrastructure-with-Seven-New-Tower-Agreements.

[6]     Each Plaintiff is a party to the MLA with the exception of Crown Castle Fiber LLC and Crown Castle USA Inc.

[7]     Pursuant to the confidentiality provisions in the MLA, MPA and DSA, each Agreement is filed under restriction, with a motion to restrict forthcoming under Local Rule 7.2.

first of its kind 5G network in the U.S."[8]  DISH recognized that "Crown Castle brings the experience and broad tower portfolio we need, from major markets to more rural areas, to help DISH bring to life the promise of our standalone, nationwide 5G network."



---

[8]    *DISH Signs Multi-Year Anchor Tenant Tower Agreement with Crown Castle* (Nov. 16, 2020),   https://www.prnewswire.com/news-releases/dish-signs-multi-year-anchor-tenant-tower-agreement-with-crown-castle-301173532.html.



**B.  The Master Product Agreement**

71.    Crown Castle Fiber LLC and DISH also entered into the MPA, an agreement affording DISH access to fiber products and data center services to support and facilitate the development of the DISH network.  Crown Castle and DISH executed the MPA on December ■,

2020.[9] ██████████████████████████████████████████████████

████████████. A copy of the MPA is attached hereto as **Exhibit B**.

██    ████████████████████████████████████████████████

██████

██    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

██    ████████████████████████████████████████████████

██████



_____

[9]    The MPA was amended on November ██ 2022, and July ██, 2024.

16

## C. The Deployment Services Agreement

75.     On May ▮, 2020, Crown Castle USA Inc. and DISH Purchasing entered into the

DSA, which governs services provided by Crown Castle in connection with installing DISH's

network equipment at tower sites.  A copy of the DSA is attached as **Exhibit I**.

▮  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

## III.   ECHOSTAR SELLS CERTAIN OF ITS SPECTRUM LICENSES TO AT&T AND SPACEX FOR BILLIONS OF DOLLARS

77.     DISH's 5G buildout faltered following its execution of the MLA and MPA.  DISH

failed to meet several spectrum license buildout commitments that EchoStar had made to the FCC,

and its network utilization lagged behind its commitments.  In its Form 10-K filed with the U.S.

Securities and Exchange Commission (the "SEC") for Fiscal Year 2023, DISH Network

Corporation disclosed that it had not met certain of its FCC coverage requirements for that year,

triggering an extension for it to meet the prerequisites for a significant portion of its available

spectrum.

78.     Following the December 31, 2023 merger between DISH Network Corporation and

EchoStar, EchoStar wrote the FCC in September 2024—on joint EchoStar and DISH letterhead—

requesting an extension of certain of its forthcoming buildout deadlines set for 2025, noting that

there was "still more that EchoStar needs to do" in order for it to become "the competitive fourth

facilities-based carrier" in the mobile wireless industry.[10]   The FCC agreed to the extension

request.

---

[10]     *See* September 18, 2024 Letter from DISH to Federal Communications Commission, https://www.fcc.gov/ecfs/document/1091867842711/1.

79.    In May 2025, however, the FCC initiated an inquiry into EchoStar's continued underutilization of its licensed spectrum.  On May 9, 2025, FCC Chairman Brendan Carr informed EchoStar by letter that he had "directed agency staff to begin a review of EchoStar's compliance with its federal obligations to provide 5G service throughout the United States per the terms of its federal spectrum licenses."[11]

80.    The risk that DISH could face adverse action by the FCC affecting its access to spectrum licenses was not only foreseeable, but was a risk known by DISH at the time it entered into the MLA and MPA.  DISH Network Corporation's Form 10-K for the year ending December 31, 2019, for example, disclosed the following risk factors:

- "Wireless services and our wireless spectrum licenses are subject to regulation by the FCC and other federal, state and local, as well as international, governmental authorities.  These governmental authorities could adopt regulations or take other actions that would adversely affect our business prospects, making it more difficult and/or expensive to commercialize our wireless spectrum licenses or acquire additional licenses."

- "The FCC grants wireless licenses for terms of generally ten years that are subject to renewal or revocation based on certain factors depending on the license including, among others, public interest considerations, level and quality of services and/or operations provided by the licensee, frequency and duration of any interruptions or outages of services and/or operations provided by the licensee, and the extent to which service is provided to, and/or operation is provided in, rural areas and tribal lands."

- "Failure to comply with FCC requirements in a given license area could result in revocation of the license for that license area."

81.    In response to Chairman Carr's letter, EchoStar has repeatedly denied that the FCC had any basis to take adverse action with respect to its spectrum licenses.  For example, in an FCC filing made on June 6, 2025, EchoStar stated that any attempt by the FCC to disrupt or otherwise

---

[11]    *See* Form 8-K, EchoStar Corporation dated May 13, 2025 (enclosing Chairman Carr's May 9, 2025 Letter).

revoke EchoStar's spectrum licenses would be "unlawful, unconstitutional, discriminatory, and utterly baseless."[12]  EchoStar further warned the FCC that any "adverse action" taken against EchoStar through the revocation of its spectrum licenses would cause significant "harm" to "tower companies," such as Crown Castle, and other of its vendors.[13]

82.    EchoStar could have continued to contest the FCC's ability to take any adverse action relating to its spectrum licenses.  It chose instead to sell them.

83.    Specifically, on August 26, 2025, EchoStar announced a definitive agreement to sell certain of its spectrum licenses—in the 3.45 GHz and 600 MHz frequencies—to AT&T for approximately $23 billion (the "AT&T Transaction").  The AT&T Transaction is expected to close in 2026, subject to regulatory approvals.

84.    Two weeks later, on September 8, 2025, EchoStar announced that it entered into a second agreement, this time with SpaceX, to sell additional spectrum licenses—in the AWS-4 and H-block frequencies—for approximately $17 billion (the "SpaceX Transaction").  The SpaceX Transaction is expected to close in 2027, subject to regulatory approvals.

85.    On November 6, 2025, EchoStar announced that it had entered into a second definitive agreement with SpaceX, to sell additional spectrum licenses for approximately $2.6 billion.  This transaction, similar to the first SpaceX Transaction, is also expected to close in 2027, subject to regulatory approvals.

---

[12]    *See* Reply Comments of EchoStar Corporation, *In the Matter of Space Bureau Opens New Docket to Explore EchoStar Corporation's Use of 2 GHz MSS Spectrum*, SB Docket No. 25-173 before the FCC (June 6, 2025) at 6.

[13]    *Id.* at 8.

86.     At no point was EchoStar ordered—by the FCC or any other government regulator or court—to enter into the AT&T and SpaceX Transactions or to dispose of the spectrum licenses.

87.     Indeed, on a public "strategy call" hosted by EchoStar on September 15, 2025, EchoStar's Chairman Ergen made clear that the spectrum licenses were not sold in any sort of fire sale, but instead at a "market price."[14]  AT&T's CEO John Stankey similarly stated that he was "well aware that what [AT&T is] paying is more than what [EchoStar] paid for spectrum at auction."  Public reporting has estimated that AT&T is paying a *$7 billion premium* over what DISH paid to acquire the spectrum licenses.[15]  As Mr. Ergen put it on the September 15 call, the AT&T and SpaceX Transactions would make EchoStar "cash-rich."

88.     After the AT&T and SpaceX Transactions close, DISH plans to transition to become a hybrid Mobile Virtual Network Operator, meaning that instead of providing its own physical network infrastructure like other wireless providers (including Verizon, AT&T, and T-Mobile), DISH apparently will lease network capacity from those providers, and sell mobile services under its Boost Mobile brand.

## IV.    ECHOSTAR AND DISH SEEK TO EVADE DISH'S CONTRACTUAL COMMITMENTS

89.     Although EchoStar admittedly will become "cash-rich" following the close of the AT&T and SpaceX Transactions, it has made clear that DISH (its wholly owned subsidiary) will

---

[14]    *EchoStar Corporation (SATS) Discusses on Pioneering What's Next: EchoStar's Vision And Strategy Call (Transcript)*, Seeking Alpha (Sept. 15, 2025), https://seekingalpha.com/article/4822911-echostar-corporation-sats-discusses-on-pioneering-whats-next-echostars-vision-and-strategy-call-transcript.

[15]    *E.g.*, *AT&T CEO admits to high price for EchoStar spectrum*, SDxCentral (Sept. 3, 2025), https://www.sdxcentral.com/news/att-ceo-admits-to-high-price-for-echostar-spectrum/.

not receive a penny of the sale proceeds, despite DISH's billions of dollars in liabilities to Crown
Castle and other partners that provided and maintained the infrastructure that made possible
EchoStar's use of the wireless spectrum it now plans to sell.  EchoStar thus structured its sale
transactions with a view towards causing DISH to avoid its contractual commitments.  While
keeping all of the proceeds for itself, EchoStar is attempting to leave DISH without access to
meaningful assets that could satisfy its significant obligations.

90.    Indeed, soon after EchoStar entered into the AT&T and SpaceX Transactions,
DISH embarked upon a campaign designed to relieve it from its obligations to its contractual
counterparties, including by sending notices asserting baseless claims of force majeure and
frustration of purpose to numerous of its tower and other infrastructure partners.  In asserting force
majeure, DISH misstated the contractual import of EchoStar's interactions with the FCC.

91.    On September 24 and 25, 2025, DISH sent two, nearly identical notices to Crown
Castle (the "September Notices"), claiming that a force majeure had occurred.[16]  In the September
Notices, DISH asserted that "EchoStar needed to sell certain spectrum licenses or face a wide-
ranging license revocation by the FCC" and that DISH was forced "to abandon its longstanding
business plan for Boost Mobile."  *See* **Exhibit C** (September 24, 2025 MLA Letter); **Exhibit D**
(September 25, 2025 MPA Letter).  DISH also stated that it is "not entitled to receive any of the
spectrum sale proceeds at closing," and that the AT&T and SpaceX Transactions—which DISH
claims were the result of "unforeseeable actions by the FCC taken outside of DISH Wireless's

---

[16]    Although DISH apparently sent the September 25 notice by mail, Crown Castle did not
receive it.  Crown Castle ultimately received the notice by email on November 6, 2025.

control"—constitute "one or more events of Force Majeure" as defined in the MPA and MLA.[17]
*See id.*

92.     The supposed force majeure event claimed by DISH has no support in the Agreements and is belied by EchoStar's public statements to its investors, the FCC, and the SEC.

93.     Contrary to DISH's claims that EchoStar was forced to sell wireless spectrum or face a "revocation" of its licenses, EchoStar had repeatedly and publicly rejected that position, telling its investors and regulators, among other things, that any revocation by the FCC would be "unlawful, unconstitutional, discriminatory, and utterly baseless"; that it did not believe the FCC could revoke its licenses; that EchoStar had "met or exceeded" all of its buildout commitments to the FCC; and that EchoStar "would win" any "battle" with the FCC.[18]

94.     Nor did the FCC "force" EchoStar or DISH to take any action.  At no time did the FCC order EchoStar to sell its spectrum licenses.  Instead, the AT&T and SpaceX Transactions are the result of business decisions entirely within the control of DISH and its affiliates.  As Mr. Ergen has acknowledged, the Transactions reflect a "market price" for EchoStar's spectrum licenses.  *Supra* ¶ 87.

---

[17]     Notwithstanding DISH's assertion, DISH also stated that "DISH Wireless needs to continue to operate certain [tower] Sites . . . for a period of time."  *See id.*

[18]     *See supra* ¶ 81 at n.12; *see also EchoStar Corporation (SATS) Discusses on Pioneering What's Next: EchoStar's Vision And Strategy Call (Transcript)*, Seeking Alpha (Sept. 15, 2025),   https://seekingalpha.com/article/4822911-echostar-corporation-sats-discusses-on-pioneering-whats-next-echostars-vision-and-strategy-call-transcript;   *FCC questions EchoStar about how it's using 5G spectrum*, Fierce Network (May 12, 2025), https://www.fierce-network.com/wireless/fcc-questions-echostar-about-how-its-using-5g-spectrum.

95.    Further, the events that precipitated the FCC's inquiry—DISH's alleged underutilization of licensed spectrum—were entirely foreseeable and within the power of DISH and EchoStar to avoid.  Indeed, DISH Network Corporation's SEC filings foresaw and recognized the risk that its spectrum licenses could be subject to revocation for various reasons, including the level, quality, and extent of the mobile wireless service DISH offered.  *Supra* ¶ 80.  The success or failure of DISH's efforts to expand its subscriber base and the reach of its network was entirely within DISH's own power to control.

96.    Although EchoStar and DISH have voluntarily changed their business strategy, they remain more than capable of paying Crown Castle what is owed under the Agreements. EchoStar has publicly acknowledged that the Transactions have "kept [EchoStar] in a marketplace in a very aggressive way without any limitations to grow and compete," that EchoStar continues to hold spectrum licenses, and that Boost Mobile still has a "great subscriber base in the marketplace" and intends to continue to be a "challenger brand" and "disruptive player" in the mobile wireless industry.[19]  Mr. Ergen has touted that the Transactions will leave EchoStar "cash-rich" and that Boost Mobile will be "way more competitive" as a "growth business" with a new business model.[20]

---

[19]    *EchoStar Corporation (SATS) Discusses on Pioneering What's Next: EchoStar's Vision And Strategy Call (Transcript)*, Seeking Alpha (Sept. 15, 2025), https://seekingalpha.com/article/4822911-echostar-corporation-sats-discusses-on-pioneering-whats-next-echostars-vision-and-strategy-call-transcript.

[20]    *See id.*

97.     In an October 9, 2025 letter, DISH asserted again that a force majeure had been triggered under the MLA, which it claimed "will not be eliminated within 180 days after the onset of such condition."  A true and correct copy of DISH's October 9 letter is attached as **Exhibit E**.

98.     In letters to DISH dated October 24, 2025 and November 14, 2025, Crown Castle rejected DISH's assertion that a force majeure had occurred and made clear that DISH remains obligated to perform under the MLA and MPA.  True and correct copies of these letters are attached as **Exhibit F** and **Exhibit G**.

99.     On November 18, 2025, Crown Castle received a letter from DISH dated November 10, 2025 in which DISH continued to assert that "DISH Wireless has been subject to actions by the [FCC] that constitute an event of Force Majeure and that frustrate the purpose of the [MLA]," claiming again that the purportedly "entirely unforeseeable" actions by the FCC left EchoStar with "no choice but to sell or forfeit spectrum that DISH Wireless needs to operate its 5G network."  A true and correct copy of this letter is attached as **Exhibit H**.

100.    As of the date of this filing, DISH continues to maintain that a force majeure has occurred.

101.    DISH's tactics here are not unique to Crown Castle, but instead are part of an industry-wide playbook that has been orchestrated by EchoStar to permit it to reap the proceeds of the AT&T and SpaceX Transactions, while simultaneously impeding DISH from making billions of dollars in contractually committed payments to its tower partners and other vendors.

102.    At least five other lawsuits have been filed against DISH by tower companies and other service providers who have similarly alleged that DISH has claimed that it is excused from performing under its lease and service agreements as a result of the Transactions.[21]

103.    In addition, dozens of DISH's other infrastructure providers have publicly stated that DISH has sought to repudiate its contractual commitments through meritless claims of force majeure or other similar doctrines, and in certain cases, has delayed or defaulted on its payment obligations.

104.    DISH's conduct here thus is part of a pattern which has been orchestrated by EchoStar to cause DISH to baselessly repudiate its contracts, while EchoStar keeps the entirety of the proceeds from the AT&T and SpaceX Transactions.

105.    EchoStar laid its strategy bare in its November 6, 2025 earnings call, where Mr. Ergen told the market that it was EchoStar's position that a force majeure had occurred to excuse DISH's performance across its various infrastructure contracts, and that EchoStar was willing to "work with" DISH's vendors to "try to resolve" the fallout—essentially a euphemism for saying that vendors like Crown Castle should be prepared to accept less than what they are owed under their agreements.[22]

---

[21]    *See Am. Towers LLC et al.* v. *DISH Wireless L.L.C.*, No. 1:25-cv-3311-SKC (D. Colo. Oct. 20, 2025); *Zayo Grp., LLC* v. *DISH Wireless L.L.C.*, No. 2025CV034300 (Colo. Dist. Ct. Nov. 26, 2025); *Sabre Indus., Inc.* v. *DISH Wireless Leasing L.L.C.*, No. 1:26-cv-00209-JAC (S.D.N.Y. Jan. 12, 2026); *Diamond Towers II LLC et al.* v. *DISH Wireless L.L.C.*, No. 2026CV30222 (Colo Dist. Ct. Jan. 19, 2026); *DataVerge LLC* v. *DISH Wireless L.L.C.*, No. 503203/2026 (N.Y. Sup. Ct., Kings Cnty. Jan. 28, 2026).

[22]    *See EchoStar Corporation (SATS) Q3 2025 Earnings Call Transcript,* Seeking Alpha (Nov. 6 2025), https://seekingalpha.com/article/4839438-echostar-corporation-sats-q3-2025-earnings-call-transcript.

106.    EchoStar's conduct constitutes tortious interference with Crown Castle's contractual relationship with DISH.

107.    EchoStar is aware of the Agreements between DISH—its wholly owned subsidiary—and Crown Castle. Indeed, EchoStar's correspondence with the FCC indicates that it was aware of DISH's contracts with its tower partners, and understood the impact of its decisions. *See supra* ¶ 81.

108.    EchoStar has improperly and intentionally forced DISH to breach those Agreements. After becoming the subject of an FCC inquiry, EchoStar decided to sell its spectrum licenses—licenses that it knew DISH required to perform under its Agreements with Crown Castle—for over $40 billion. In so doing, EchoStar intends to leave DISH unable to satisfy the substantial contractual liabilities that it has to Crown Castle and its other infrastructure providers. DISH has already signaled as much, stating in its correspondence to Crown Castle that it is "not entitled to receive any of the spectrum sale proceeds at closing," implying that it lacks the financial wherewithal to pay Crown Castle. This is a transparent, improper, and coordinated pressure tactic by EchoStar and DISH to attempt to force Crown Castle to accept less than what it is owed under the Agreements.

109.    EchoStar has caused DISH to assert meritless claims of force majeure, involving false and misleading statements surrounding the FCC's inquiry into EchoStar. Indeed, the positions taken by DISH in claiming force majeure are directly contradicted by EchoStar's own public statements. In its correspondence with Crown Castle, DISH has stated that EchoStar was required to sell its spectrum licenses to avoid revocation by the FCC, even while EchoStar publicly

declared that any effort to revoke its licenses would be "unlawful, unconstitutional, discriminatory, and utterly baseless."

110.     Despite EchoStar's full knowledge of DISH's contractual obligations to Crown Castle, it has proceeded with rendering DISH unable to fulfill its contractual liabilities.  EchoStar stands to gain tens of billions of dollars in proceeds from the AT&T and SpaceX Transactions while it uses DISH to try to avoid over $3.5 billion in contractual payments owed to Crown Castle.  By ensuring that none of the proceeds from the Transactions will reach DISH, EchoStar is transparently trying to insulate itself from the consequences of DISH's contractual breaches.

## V.     DISH AND DISH PURCHASING HAVE BREACHED THEIR AGREEMENTS BY FAILING TO MAKE REQUIRED PAYMENTS TO CROWN CASTLE

111.     In furtherance of EchoStar's scheme, after Crown Castle filed this lawsuit, DISH and its affiliate, DISH Purchasing, breached their respective agreements with Crown Castle by failing to make required payments.

112.     DISH's failure to make payments to Crown Castle is not an isolated incident.  Instead, DISH has stopped paying other infrastructure partners throughout the industry.[23]

113.     ***DISH Has Stopped Paying Under and Has Breached the MLA***.  On December 1, 2025 and December 16, 2025, DISH failed to timely pay Crown Castle ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ in contractual payments that had come due under the MLA for over 12,000 tower sites.  On December 3, 2025 and December 17, 2025, Crown Castle sent DISH breach notices

---

[23]     *See, e.g.*, *Multiple Contractors Allege They're Being Pressured to Accept Deep Discounts on Completed Work for DISH* (Oct. 13, 2025), https://wirelessestimator.com/articles/2025/multiple-contractors-allege-theyre-being-pressured-to-accept-deep-discounts-on-completed-work-for-dish/; *Diamond Towers II LLC et al.* v. *DISH Wireless L.L.C.*, No. 2026CV30222 (Colo Dist. Ct. Jan. 19, 2026).

under the MLA, which notified DISH of its breaches of the MLA.  True and correct copies of these notices are attached hereto as **Exhibit J** and **Exhibit K**.

114.　

DISH failed to cure its breaches and has made no payments to Crown Castle.

115.　██████████████████████, on January 9, 2026, Crown Castle sent DISH a termination notice, terminating DISH's leases under the MLA for the over 12,000 sites for which DISH had defaulted on its payment obligations.  Under the MLA, upon termination, ████

Accordingly, DISH owes—and has failed to pay—Crown Castle more than $3.5 billion.  A true and correct copy of Crown Castle's termination notice is attached as **Exhibit L**.

116.　***DISH Stopped Paying Under and Has Breached the MPA***.  DISH also has breached the MPA by failing to make required payments.  For example, DISH failed to pay two invoices that came due in November and December 2025, totaling ████████, for fiber services rendered by Crown Castle at over 1,000 different locations.

117.　On October 24, 2025 and January 9, 2026, Crown Castle sent DISH breach notices as to its missed payments under the MPA.  To date, DISH has not cured its breaches.  True and correct copies of these breach notices are attached as **Exhibit M** and **Exhibit N**.

118.　***DISH Stopped Paying Under and Has Breached the DSA***.  DISH Purchasing also failed to satisfy its payment obligations under the DSA.  DISH Purchasing admitted that it refused to pay in retaliation for Crown Castle bringing this lawsuit.

119.    Crown Castle has issued invoices for services rendered under the DSA, totaling
███████████████████.  In breach of the DSA, DISH Purchasing has failed to timely remit
payment to Crown Castle ███████████████████████████████.

120.    On December 1, 2025, a Crown Castle employee emailed a Senior Manager at
DISH Purchasing to follow up on DISH's unpaid invoices.

121.    The DISH Purchasing manager responded that same day, stating that he was "not
currently in a position to address these payments in light of the lawsuit Crown recently filed against
us."

122.    Although DISH Purchasing has revealed it will not make payments under the DSA
because Crown Castle has initiated this lawsuit, DISH Purchasing has made baseless assertions in
correspondence with Crown Castle in an attempt to excuse its failure to live up to its contractual
obligations, based upon supposed procedural errors in certain of the invoices submitted by Crown
Castle.

123.    On November 25, 2025, Crown Castle sent DISH Purchasing a breach notice
related to certain of its missed payments under the DSA.  A true and correct copy of this breach
notice is attached as **Exhibit O**.

124.    To date, DISH Purchasing has not paid the outstanding amounts owed under the
DSA.

## FIRST CLAIM FOR RELIEF

**(Declaratory Judgment Against DISH That a Force Majeure Has Not Occurred Under the MLA)**

125.    Crown Castle incorporates the foregoing allegations by reference.

126.    On November ▮, 2020, Crown Castle lessors and DISH executed the MLA, effective as of November ▮, 2020.

127.    Under the terms of the MLA, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

128.    On September 24, 2025, DISH purported to notify Crown Castle that, as a result of the FCC's recent inquiry and the planned closings of the AT&T and SpaceX Transactions, a force majeure event had occurred as defined in the MLA.

129.    That notice was baseless under the MLA and contrary to the requirements for force majeure under controlling Colorado law.

▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

131.    None of the events described by DISH constitute a force majeure under the MLA.

132.    An actual and substantial controversy exists between the parties regarding their rights and obligations under the MLA, including whether a force majeure event has occurred under

that Agreement and whether DISH remains obligated to perform its forthcoming payment obligations under the MLA. This controversy is immediate, real, ongoing, and justiciable.

133.    Pursuant to 28 U.S.C. §§ 2201 and 2202, Crown Castle is entitled to a declaration confirming that no force majeure has occurred under the MLA, that DISH is not excused from performing any of its obligations thereunder, and that the MLA remains in full force and effect.

134.    Such declaration would resolve the present controversy.

**SECOND CLAIM FOR RELIEF**

**(Declaratory Judgment Against DISH That a Force Majeure Has Not Occurred Under the MPA)**

135.    Crown Castle incorporates the foregoing allegations by reference.

136.    On December ██, 2020, Crown Castle Fiber LLC and DISH entered into the MPA.

137.    Under the terms of the MPA, ████████████████████████████████
████████████████████████████

138.    On September 25, 2025, DISH purported to notify Crown Castle that, as a result of the FCC's recent inquiry and the planned closings of the AT&T and SpaceX Transactions, a force majeure had occurred as defined in the MPA.

139.    That notice was baseless under the MPA and contrary to the requirements for force majeure controlling Colorado law.

██ ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

141.    None of the events described by DISH constitute a force majeure under the MPA.

142.    An actual and substantial controversy exists between the parties regarding their rights and obligations under the MPA, including whether a force majeure event has occurred under that Agreement and whether DISH remains obligated to perform its forthcoming payment obligations under the MPA.  This controversy is immediate, real, ongoing, and justiciable.

143.    Pursuant to 28 U.S.C. §§ 2201 and 2202, Crown Castle is entitled to a declaration confirming that no force majeure has occurred under the MPA, that DISH is not excused from performing any of its obligations thereunder, and that the MPA remains in full force and effect.

144.    Such declaration would resolve the present controversy.

### THIRD CLAIM FOR RELIEF

### (Breach of the MLA by DISH)

145.    Crown Castle incorporates the foregoing allegations by reference.

146.    On November ██, 2020, Crown Castle lessors and DISH executed the MLA, effective as of November ██, 2020.

147.    The MLA is a valid and binding contract governed by Colorado law.

148.    Crown Castle has at all times performed its obligations under the MLA in all material respects.

149.    Under the terms of the MLA, ███████████████████████████████████
████████████████████████████████████████

150.    In December 2025, DISH stopped making payments under the MLA.  As of December 17, 2025, DISH had failed to timely make at least two payments that had come due under the MLA, ████████████████████████████████, respectively.  DISH's failure to timely pay amounts due under the MLA constitutes a breach of the MLA.



152.    Crown Castle has suffered damages as a direct and proximate result of DISH's breaches in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### (Breach of the MPA by DISH)

153.    Crown Castle incorporates the foregoing allegations by reference.

154.    On December ██, 2020, Crown Castle Fiber LLC and DISH entered into the MPA.

155.    The MPA is a valid and binding contract governed by Colorado law.

156.    Crown Castle has at all times performed its obligations under the MPA in all material respects.

157.    Under the terms of the MPA, ████████████████████████████████

████████████████████████████████████████████

158.    DISH has stopped making ████████████████████ payments that have

come due under the MPA.  DISH's failure to timely pay amounts due under the MPA constitutes

a breach of the MPA.

159.    Crown Castle has suffered damages as a direct and proximate result of DISH's

breaches in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### (Breach of the DSA by DISH Purchasing)

160.    Crown Castle incorporates the foregoing allegations by reference.

161.    On May ██, 2020, Crown Castle USA Inc. and DISH Purchasing entered into the

DSA.

162.    The DSA is a valid and binding contract governed by Colorado law.

163.    Crown Castle has at all times performed its obligations under the DSA in all

material respects.

██   ████████████████████████████████████████

████████████████████

165.    Crown Castle sent invoices to DISH Purchasing for ████████████████ in

fees for services rendered under the DSA.  DISH has not paid those invoices in breach of the DSA.

166.    On December 1, 2025, DISH Purchasing informed Crown Castle that it was

refusing to pay these invoices because Crown Castle filed this lawsuit.

167.    Crown Castle has suffered damages as a direct and proximate result of DISH Purchasing's breaches in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### (Tortious Interference of Contract Against EchoStar)

168.    Crown Castle incorporates the foregoing allegations by reference.

169.    On November █, 2020, Crown Castle lessors and DISH executed the MLA, effective as of November █, 2020.

170.    On December █, 2020, Crown Castle Fiber LLC and DISH entered into the MPA.

171.    DISH has been a wholly owned subsidiary of EchoStar at all times relevant to this action.

172.    EchoStar had knowledge of the MLA and MPA between Crown Castle and DISH.

173.    EchoStar improperly and intentionally interfered with DISH's ability to perform under the MLA and MPA, including by developing a scheme where it has forced DISH to breach its obligations to pay Crown Castle under the Agreements and make false claims of force majeure in an attempt to justify those contractual breaches.

174.    Crown Castle has suffered damages as a direct and proximate result of EchoStar's intentional and improper interference in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Crown Castle is entitled to a judgment against DISH, DISH Purchasing, and EchoStar:

a.    Declaring that:  (i) no force majeure has occurred under the MLA; (ii)  DISH is not excused from performing its obligations under the MLA; (iii) the MLA

remains in full force and effect; and (iv) DISH remains obligated to perform all of its obligations under the MLA;

b.   Declaring that: (i) no force majeure has occurred under the MPA; (ii) DISH is not excused from performing its obligations under the MPA; (iii) that the MPA remains in full force and effect; and (iv) DISH remains obligated to perform all of its obligations under the MPA;

c.   Awarding Crown Castle all available damages for DISH's intentional and uncured breaches of the MLA;

d.   Awarding Crown Castle all available damages for DISH's intentional and uncured breaches of the MPA;

e.   Awarding Crown Castle all available damages for DISH Purchasing's intentional and uncured breaches of the DSA;

f.   Awarding Crown Castle all available damages for EchoStar's tortious interference with Crown Castle's contractual relationship with DISH;

g.   Awarding Crown Castle its costs in this action as well as reasonable attorneys' fees; and

h.   Awarding any other relief as the Court deems just and proper.

Dated: January 30, 2026

Respectfully submitted,

By: */s/ Laura A. Menninger*

Laura A. Menninger
HADDON MORGAN FOREMAN
945 N. Pennsylvania Street
Denver, CO 80203
Tel: (303) 831-7364
Email: lmenninger@hmflaw.com

Jay Cohen
Jeffrey J. Recher
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990
Email: jaycohen@paulweiss.com
      jrecher@paulweiss.com

*Counsel for Plaintiffs Aircomm of Avon, LLC; Atlantic Coast Communications LLC; CCATT LLC; CCTMO LLC; CCTM1 LLC; CCTM2 LLC; Coverage Plus Antenna Systems LLC; Crown Atlantic Company LLC; Crown Castle Fiber LLC; Crown Castle GT Company LLC; Crown Castle MU LLC; Crown Castle South LLC; Crown Castle Towers 05 LLC; Crown Castle Towers 06-2 LLC; Crown Castle Towers 09 LLC; Crown Castle USA Inc.; Crown Communication LLC; Global Signal Acquisitions LLC; Global Signal Acquisitions II LLC; Global Signal Acquisitions III LLC; Global Signal Acquisitions IV LLC; GoldenState Towers, LLC; High Point Management Co. LLC; ICB Towers, LLC; Interstate Tower Communications LLC; IntraCoastal City Towers LLC; Pinnacle Towers Acquisition LLC; Pinnacle Towers Asset Holding LLC; Pinnacle Towers LLC; Pinnacle Towers III LLC; Radio Station WGLD LLC; Shaffer & Associates, Inc.; Sierra Towers, Inc.; Tower Development Corporation; Tower Systems LLC; Tower Technology Company of Jacksonville LLC;*

*Tower Ventures III, LLC; WCP Wireless Lease Subsidiary, LLC; and TVHT, LLC.*

**ARTIFICIAL INTELLIGENCE CERTIFICATION**

Pursuant to the Court's Standing Order Regarding the Use of Generative Artificial Intelligence in Court Filings, the undersigned counsel certifies that generative artificial intelligence was not used to draft this filing.

Respectfully submitted,

*/s/ Laura A. Menninger*

Laura A. Menninger
HADDON MORGAN FOREMAN
945 N. Pennsylvania Street
Denver, CO 80203
Tel: (303) 831-7364
E-mail: lmenninger@hmflaw.com

Jay Cohen
Jeffrey J. Recher
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990
E-mail: jaycohen@paulweiss.com
          jrecher@paulweiss.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2026, a true and correct copy of the foregoing document was e-filed and served through the CM/ECF system which will service notice on all counsel of record in this case.

/s/ Laura A. Menninger
Laura A. Menninger